UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
MARIA AUGUSTA                              :
FAREZ-ESPINOZA                             :
                                           :      08 Civ. 11060 (HB)
              Petitioner,                  :
                                           :      <u>**OPINION & ORDER**</u>
    -against-                              :
                                           :
MICHAEL CHERTOFF, Secretary,               :
Department of Homeland Security, and       :
MICHAEL MUKASEY, Attorney                  :
General of the United States,              :
                                           :
              Respondents.                 :
------------------------------------------------------x

**Hon. Harold Baer, Jr., District Judge:**

  Petitioner Maria Augusta Farez-Espinoza ("Farez-Espinoza") filed the instant *habeas corpus* petition pursuant to 28 U.S.C. § 2241 challenging her detention by the Department of Homeland Security ("DHS"), naming as respondents the Secretary of DHS and the United States Attorney General (collectively, "Respondents" or "Government").[1] Farez-Espinoza essentially challenges her detention as being without statutory basis and unconstitutional in violation of her Due Process rights. In addition to disputing the merits of Farez-Espinoza's *habeas* petition, the Government additionally argues that (1) this court lacks jurisdiction over the petition; (2) Respondents are wrongly named in the petition; and (3) venue is improper in this district. For the reasons set forth below, this Court disagrees with the Government's position and the petition is granted.

## I. BACKGROUND[2]

  Farez-Espinoza is a citizen of Ecuador and came to the United States two and a half years ago, on July 27, 2006. On the same day, Farez-Espinoza, a teenager at the time, was served with a Notice to Appear alleging that she was removable pursuant to 8 U.S.C. § 1182(a)(6)(A)(i) as an

---

[1] Petitioner's initial petition, dated December 1, 2008, was styled as a "Petition for a Writ of Habeas Under the All Writs Act." However, the substance of the petition challenged the petitioner's continued detention and requested release so that she could attend a scheduled appointment relating to her pending application for an adjustment of status pursuant to Section 245 of the Immigration and Nationality Act. Therefore, this court construed the petition as one for a writ of *habeas corpus* pursuant to §2241. *See* Order to Show Cause, dated January 9, 2009.

[2] The basic facts of this case do not appear to be in dispute. They are taken from Petitioner's *habeas corpus* petition, as well as the parties' letter submissions to the Court and the parties' representations at the conference held with the Court on January 16, 2009.

alien present in the United States without having been admitted or paroled.  Farez-Espinoza is the natural-born daughter of Jose Farez, who is married to Carmela Farez-Leone, a naturalized United States citizen for more than twenty years.  Farez-Espinoza lived with her father, step-mother and younger sister at their home in Ridgewood, New York from her arrival in this country until October 27, 2008, when she was detained.  Based on representations of Farez-Espinoza's counsel, which have gone unrefuted by the Government, officials of DHS and the Bureau of Immigration and Customs Enforcement ("ICE") have been aware of Farez-Espinoza's address and whereabouts at all relevant times.

Farez-Espinoza appeared before the United States Immigration Court in this district on November 30, 2006.  Thereafter, a removal hearing was scheduled for July 17, 2007; however, her attorney who had represented her in her immigration proceedings failed to advise her that she was to appear before the Immigration Court on that date for her removal hearing.  Upon her failure to appear at the removal hearing, the Immigration Court entered an Order of Removal on July 19, 2007.  Farez-Espinoza alleges that she never received notice of the Order of Removal.

On October 27, 2008, Farez-Espinoza was apprehended for nonpayment of a $2.00 New York City subway fare and was taken into custody by the New York City Police Department.  Farez-Espinoza has no previous criminal record.  On the day of her arrest, when it was discovered that she had been ordered removed by the Immigration Court, Farez-Espinoza was placed into the custody of ICE.  She was detained briefly and processed at the Varick Street Service Processing Center in Manhattan ("Varick Street") and was transferred later the same day to a detention facility in Kearny, New Jersey.  Farez-Espinoza remained at the New Jersey facility until December 23, 2008, when she was transferred to another detention facility, this one in Bloomsburg, Pennsylvania, where she remains in custody today.

Upon learning, apparently for the first time, of the Order of Removal entered against her, Farez-Espinoza filed an appeal of the Order to the Board of Immigration Appeals ("BIA") on October 28, 2008.  On November 24, 2008, the BIA found that, in order to exhaust her administrative remedies, Farez-Espinoza must first file a motion to reopen her case before the Immigration Court pursuant to Section 240(b)(5)(C) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1229a(b)(5)(C).[3]  The Government conceded at the January 16, 2009

---

[3] 8 U.S.C. § 1229a(b)(5)(C) provides that if an alien has been ordered removed in abstentia, the order may be rescinded only upon "(i) a motion to reopen filed within 180 days after the date of the order of removal if the alien demonstrates that failure to appear was because of exceptional circumstances, or (ii) upon a motion to reopen filed at any time if the alien demonstrates that the alien did not receive notice . . . ." As

2

conference with the Court that if the Immigration Court were to grant Farez-Espinoza's motion to reopen her case, the Order of Removal would be automatically stayed. Counsel for the Government further represented at the conference that it would not oppose such a motion if the Farez-Espinoza were to file one.

On December 1, 2008, after more than a month in custody, Farez-Espinoza filed the instant *habeas* petition, challenging her physical custody and requesting specifically that she be released so that she could attend a scheduled appointment "to be fingerprinted December 17, 2008," the date on which she was scheduled to have her biometrics taken at a United States Citizenship and Immigration Services ("USCIS") Application Support Center ("ASC") to be reviewed for an adjustment of status pursuant to Section 245 of the INA. The petition was received by this Court's Pro Se Office on December 3, 2008, but unfortunately was not filed with the Clerk of the Court until December 19, 2008, two days after the date of her scheduled biometrics appointment.

On January 9, 2009, this Court entered an Order construing the petition as a writ of *habeas corpus* to include attendance of the biometrics appointment scheduled by the USCIS ASC and as an order to show cause why she should not be released for such biometrics appointment and for any other proceeding relating to her immigration case. *See* Order to Show Cause, dated January 9, 2009. This Court based its Order expressly on the finding that it did not construe the Farez-Espinoza's request as a challenge to the BIA's decision in her pending immigration proceeding; rather, this Court determined that the petition was one challenging her physical detention. *See id.*

On January 20, 2009, as directed by the BIA, Farez-Espinoza filed a motion to reopen her case before the Immigration Court. The Government did not oppose the motion and the Immigration Court issued a stay of removal pending resolution of her immigration case. Therefore, as the Government has apparently conceded, the Order of Removal is not currently in effect, and Farez-Espinoza's removal to Ecuador is, at least temporarily, on hold.

## II. DISCUSSION

**A.     Jurisdiction**

As a preliminary matter, I will briefly respond to the Government's argument that, because ICE has authority to detain aliens subject to a final order of removal, this Court lacks

---

Petitioner has demonstrated, with no dispute from the Government, that she had no notice of the entry of the Order of Removal, subsection (ii) of the provision applies.

jurisdiction to consider Farez-Espinoza's petition. Specifically, the Government has argued that this Court lacks jurisdiction "because habeas jurisdiction extends only to purely legal statutory questions and constitutional claims." Government's Letter, dated January 15, 2009, at 3. The Government is quite right that this Court's jurisdiction over Farez-Espinoza's *habeas* petition is limited to challenges to her detention based on "purely legal statutory and constitutional claims." *See Calcano-Martinez v. I.N.S.*, 232 F.3d 328, 342 (2d Cir. 2000), *aff'd*, 533 U.S. 348 (2001). However, this limitation is not quite as circumscribed as the Government contends. Farez-Espinoza's petition challenges not the Immigration Court's Order of Removal, but rather the statutory authority for and constitutionality of her continued detention under the immigration laws. The former challenge is precisely the type of challenge that would not be properly before this Court, and would require an exhaustion of the immigration process through the Immigration Court, BIA and ultimately the Second Circuit. *See Sol v. I.N.S.*, 274 F.3d 648, 651 (2d Cir. 2001) (holding "that federal jurisdiction over § 2241 petitions does not extend to review of discretionary determinations by the [Immigration Judge] and the BIA"); *Kyei v. I.N.S.*, 65 F.3d 279, 284 (2d Cir. 1995) ("To hold otherwise would interfere with the INS's and BIA's ability to develop a comprehensive law enforcement policy, and would do so for no good reason."). Indeed, as the Government aptly has noted, the REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, 119 Stat. 231 (2005), unequivocally divests federal district courts of subject matter jurisdiction to review removal orders. *See* 8 U.S.C. § 1252(b); *De Ping Wang v. Dep't of Homeland Sec.*, 484 F.3d 615, 618 (2d Cir. 2007) ("[T]he REAL ID Act eliminated the availability of habeas corpus as a separate means of obtaining judicial review of a final order of removal."). Under the REAL ID Act, the only means to seek such relief is a Petition for Review filed in the circuit court in the judicial circuit in which the immigration judge completed the proceedings. 8 U.S.C. § 1252(b)(2).

However, the REAL ID Act certainly does not divest the district court of jurisdiction over any *habeas corpus* petition merely because it is filed by an alien who is the subject of parallel proceedings in the Immigration Court. Indeed, as this Court has held previously: "[t]he REAL ID Act does not provide for transfer of that part of a habeas petition that simply challenges current detention by immigration authorities. . . [I]t is appropriate for the district court to deal with that issue." *Washington v. District Dir., I.N.S.*, No. 04 Civ. 3492 (RMB)(MHD), 2005 WL 2777314, at *3 (S.D.N.Y. Aug. 26, 2005)(internal citations omitted). This finding is consistent with the Second Circuit's holding that federal district courts retain jurisdiction under § 2241 to

grant writs of *habeas corpus* to aliens "when those aliens are in custody in violation of the Constitution or laws or treaties of the United States." *Henderson v. I.N.S.*, 157 F.3d 107, 122 (2d Cir. 1998) (quoting 28 U.S.C. § 2241) (internal quotation marks omitted).  Numerous courts in other circuits, as well as district courts in this circuit, likewise have held that issues that are purely legal in nature, raised by aliens detained under the immigration laws are encompassed by a district court's § 2241 *habeas* jurisdiction.  *See, e.g.*, *Goncalves v. Reno*, 144 F.3d 110, 133 (1st Cir. 1998) ("The scope of [§ 2241] habeas jurisdiction is not limited to constitutional claims, but encompasses at least the pure issues of law concerning the applicability of statutory provisions" by the Attorney General to aliens); *Lee v. Reno*, 15 F. Supp. 2d 26, 42-43 (D.D.C. 1998) (finding that § 2241 extends to all constitutional claims and to issues of statutory construction); *Ncube v. I.N.S. Dist. Dirs. & Agents*, 98 Civ. 0282 (HB)(AJP), 1998 U.S. Dist. LEXIS 18902, at *34 (S.D.N.Y. Dec. 2, 1998) ("In short, the Second Circuit's *Henderson* decision makes clear that § 2241 allows review of all constitutional issues and at least statutory interpretation issues affecting an alien's substantive rights.").

In this case, Petitioner has stated two independent bases for her challenge to her detention.  First, she argues essentially that in prolonging her detention, Respondents have violated the removal provisions of the INA.  Second, she argues that her continued detention is in violation of her Due Process rights.  Each of these claims of unlawful detention is "a pure question of law" under the Second Circuit's decision in *Henderson*, and therefore clearly within the *habeas* jurisdiction of this Court.

### B.     Proper Respondent

The Government also argues that based on Farez-Espinoza's current detention in Bloomsburg, Pennsylvania, the named Respondents in her *habeas* petition are wrong, and the *habeas* statute requires that she name the warden of the facility where she is held as the respondent.  For this proposition, the Government relies on the Supreme Court's holding in *Rumsfeld v. Padilla*, 542 U.S. 426 (2004).  The Government's reliance on *Padilla* is misplaced.

Pursuant to the *habeas* statute, a writ of *habeas corpus* "shall be directed to the person having custody of the person detained."  28 U.S.C. § 2243; *see also* 28 U.S.C. § 2242 (providing the proper respondent to a *habeas* petition is "the person who has custody over [the petitioner]").  As the Court found in *Padilla*, the custodian to be named petitioner is "the person with the ability to produce the prisoner's body before the habeas court."  542 U.S. at 435.  The Court went on to describe that "[t]hese provisions contemplate a proceeding against some person who has the

5

*immediate custody* of the party detained, with the power to produce the body of such party before the court or judge, that he may be liberated if no sufficient reason is shown to the contrary." *Id.* (citing *Wales v.* Whitney, 114 U.S. 564, 574 (1885)) (emphasis in original).[4]  Thus, the *Padilla* Court held, "the default rule is that the proper respondent is the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official." *Id.* Importantly, however, the Court expressly declined to decide whether its reasoning applied to immigration cases. *Id.* at 435 n.8.  Therefore, the Government's reliance exclusively on the holding in *Padilla* does little to support its contention that the Respondents are improperly named in Farez-Espinoza's petition.

Furthermore, although the Second Circuit also has declined formally to hold that naming the Attorney General is proper in alien *habeas* petitions, *see Henderson*, 157 F.3d at 124, its lengthy analysis of the "extraordinary and pervasive role" is supportive of this Court's conclusion that the Respondents are properly named in this case:

> The unique role that the Attorney General plays in immigration matters may be taken to suggest that [he] may be a proper respondent in alien habeas cases.  Congress has consistently designated the Attorney General as the legal custodian of the petitioners [under 8 U.S.C. § 1226(e)(1)] . . . Similarly, the Attorney General is named as proper respondent in most court actions reviewing the legality of removal orders. . . There is also no question that the Attorney General has the power to produce the petitioners, remains the ultimate decisionmaker as to matters concerning the INS, . . . and is commonly designated a respondent in these cases, even when personal jurisdiction over the immediate custodian clearly lies.  In this respect, *the extraordinary and pervasive role that the Attorney General plays in immigration matters is virtually unique*.  Thus, the Attorney General continues to be in complete charge of the proceedings leading up to the order directing the removal of aliens from the country and has complete discretion to decide whether or not removal shall be directed.

*Id.* at 125-26 (internal quotation marks and alterations omitted) (emphasis added); *see also Somir*, 354 F. Supp. 2d at 217-18 (finding Attorney General is custodian of aliens due to "the near total control exercised by the Attorney General over aliens facing exclusion and deportation

---

[4] However, as Judge Berzon noted in his dissent in *Armentero v. I.N.S.*, 412 F.3d 1088 (9th Cir. 2005), "the immediate custodian rule, at least as enunciated in *Wales [v. Whitney]*, is based on what is today a legal anachronism: that the petitioner is actually to be brought before the court. . . Today, . . . the more central question raised in a habeas petition is whether the respondent has the authority to effectuate the petitioner's release."  412 F.3d at 1098 (Berzon J., dissenting).

proceedings"). Therefore, this Court finds, along with numerous other courts in this District, that the United States Attorney General is a proper respondent in immigration cases where the petitioner challenges her detention under the immigration laws. *See, e.g.*, *Somir v. United States*, 354 F. Supp. 2d 215, 217 (E.D.N.Y. 2005); *Batista-Taveras v. Ashcroft*, No. 03 Civ. 1968 (LAK), 2004 WL 2149095, at *6 (S.D.N.Y. Sept. 23, 2004); *Garcia-Rivas v. Ashcroft*, No. 04 Civ. 292 (NRB), 2004 WL 1534156, at *2 (S.D.N.Y. July 7, 2004); *Bell v. Ashcroft*, 03 Civ. 0766 (HB), 2003 U.S. Dist. LEXIS 18425, at *10 (S.D.N.Y. Oct. 15, 2003) (concluding same, pre-*Padilla*). Due to his comparable level of oversight over ICE and the deportation process and removal determinations, I also find that the Secretary of DHS is likewise a proper respondent to Farez Espinoza's petition. *See Armentero v. I.N.S.*, 412 F.3d 1088 (9th Cir. 2005) (Berzon, J., dissenting) (finding that the proper respondent for habeas petition must be someone who has authority over the detention of the prisoner, and that in the immigration context, this authority often lies with the Attorney General or Secretary of DHS). Because Farez-Espinoza is being held by the Government – *i.e.*, the Attorney General and DHS – and not the warden of the prison in which Farez-Espinoza currently is detained, I find that Respondents Secretary Chertoff and Attorney General Mukasey are properly named in the instant petition. *See Serna v. Sec'y of the Dep't of Homeland Sec.*, No. 06cv305 (JBA), 2006 U.S. Dist. LEXIS 40317, at *8 (D. Conn. June 19, 2006) ("[U]nlike the 'core' situation of a prisoner challenging a conviction or pre-trial detention, naming the warden of the facility where [petitioner] is currently incarcerated would not serve the purpose of the immediate custodian rule because if named as respondent, the warden would have to look to BICE for authority to release petitioner from detention as petitioner is held in that facility only on the authority of a BICE detainer. A federal respondent is thus necessary to the adjudication of Serna's petition").

  **C.**  **Venue**

  Having determined that the Respondents are properly named in the petition, I turn to the Government's argument, also apparently premised on the Supreme Court's ruling in *Padilla*, that venue is not proper in this district. *See Reyes-Cardenas*, No. 05 cv 5687 (KMW)(RLE), 2007 WL 1290141, at *5 (S.D.N.Y. Apr. 30, 2007); *Somir*, 354 F. Supp. 2d at 218-19. Again, the Government's reliance on *Padilla* is misplaced.

  The Supreme Court held in *Padilla* that "[t]he plain language of the habeas statute . . . confirms the general rule that *for core habeas petitions* challenging present physical confinement, jurisdiction lies in only one district: the district of confinement." 542 U.S. at 443

7

(emphasis added).  The "plain language" to which the *Padilla* Court referred to § 2241(a), which provides that district courts are limited to granting habeas relief "within their respective jurisdictions."  28 U.S.C. § 2241.  However, the holding in *Padilla*, by its own terms, is limited to *core habeas* petitions.  *Habeas* proceedings involving aliens detained pending removal are not core *habeas* proceedings; therefore, the holding in *Padilla* is inapposite here.  *See Reyes-Cardenas*, 2007 WL 1290141 at *4; *Campbell v. Ganter*, 353 F. Supp. 2d 332, 337 (E.D.N.Y. 2004).

Rather, it is "traditional principles of venue" that govern alien *habeas* cases.  *See Braden v. 30th Judicial Circuit Court of Ky.*, 410 U.S. 484, 493 (1973); *cf.* Armentero, 412 F.3d at 1099, 1101 (Berzon, J., dissenting) ("*Padilla* left *Braden* intact" with respect to the venue analysis); *see also* Henderson, 157 F.3d at 127.  The federal venue statute, 28 U.S.C. § 1391(e) states:

> [a] civil action in which a defendant is an officer or employee of the United States . . . may . . . be brought in any judicial jurisdiction in which (1) a defendant in the action resides, (2) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) the plaintiff resides if no real property is involved in the action.

In determining whether venue is proper in a particular district, a court must consider the following factors: (1) where all material events took place; (2) where records and witnesses pertinent to the petitioner's claim are likely to be found; and (3) the relative convenience of the forum for the parties.  *Henderson*, 157 F.3d at 128 n.25 (citing *Braden*, 410 U.S. at 493-94); *see also Leroy v. Great Western United Corp.*, 443 U.S. 173, 186-87 (1979) (noting that the convenience of the defendants and the location of evidence and witnesses are relevant in determining appropriate venue); *Somir*, 354 F. Supp. 2d at 218-19 (declining to transfer venue to district where petitioner alien was detained because the Eastern District of New York was where he had lived with his family until he was detained, the conduct and activities relevant to the proceedings occurred there, potential witnesses were located there, and the issues underlying the petition had been briefed to that court); *compare King v. Gonzales*, 02 cv 3847 (JG), 2005 U.S. Dist. LEXIS 20342, at *11-12 (E.D.N.Y. Aug. 16, 2005) (finding venue improper when removal proceedings and events related to detention took place in a different district than where *habeas* petition was brought).

In this case, traditional principles of venue favor a finding that venue is proper in this district.  Policy considerations and the underlying concept of fair play also support this

proposition. The key events and circumstances leading to Farez-Espinoza's detention and petition took place in this district. First, Farez-Espinoza's parallel proceeding before the Immigration Court, including the entry of the final order of removal, took place in this district and will proceed in here now that the Farez-Espinoza has filed her motion to reopen that proceeding. *See Campbell*, 353 F. Supp. 2d at 338 (finding venue for *habeas* petition was proper in district where petitioner's parallel criminal proceedings took place). Further, the key event that led to Farez-Espinoza's detention and her instant *habeas* petition – non-payment of subway fare and detention by NYPD – took place in this district. The witnesses Farez-Espinoza is likely to call at her immigration proceeding – primarily her father and step-mother – are located here as well. And, while it is unclear where Farez-Espinoza's immigration records are available, "with the advantages of modern technology, including faxes, scanners, and email, the difficulty of transferring the required immigration records ought to be minimal." *Serna*, 2006 U.S. Dist. LEXIS 40317, at *19.

This district appears also to be by far more convenient for the parties than the district in which Farez-Espinoza is detained. As noted earlier, Farez-Espinoza's family and any witnesses in the underlying immigration proceedings are in New York. Further, counsel for both Farez-Espinoza and the Government are in New York City. This is a factor that weighs particularly heavily in favor of retaining venue here, as pro se petitioners often find it even more difficult to find counsel when the Attorney General transfers them to far-away detention facilities. *See Bell*, 2003 U.S. Dist. LEXIS 18425, at *9-10. Finally, I note that this issue has been the subject of comprehensive legal arguments by counsel for Farez-Espinoza and the Government in the form of numerous letters with points and authorities, as well as oral argument before the Court at the January 16, 2009 hearing. Thus, this Court is quite familiar with the facts and circumstances of the case, and "the predisposition in this Circuit to reach the merits of a dispute in service to judicial economy compel the assertion of jurisdiction by this Court." *Santos-Gonzales v. Reno*, 93 F. Supp. 2d 286, 292 (E.D.N.Y. 2000) (internal quotation marks and citations omitted); *see also Somir*, 354 F. Supp. 3d at 219; *Campbell*, 353 F. Supp. 2d at 338. The Middle District of Pennsylvania, on the other hand, other than being the district in which Farez-Espinoza is currently detained, has no connection whatsoever with this case.

While this Court is not unsympathetic to the Government's asserted concerns of "forum shopping," this Court agrees with the Second Circuit that the strict application of traditional principles of venue minimize those concerns. *See Henderson*, 157 F.3d at 128; *see also Serna*,

2006 U.S. Dist. LEXIS 40317, at *17; *Campbell*, 353 F. Supp. 2d at 338.  Indeed, the venue doctrine serves to mitigate potential forum shopping by the Government itself – if venue is proper only in the district in which the petitioner is detained, the Government easily could evade the laying of proper venue by continuously transferring detainees at its unilateral discretion.  *See Bell*, 2003 U.S. Dist. LEXIS 18425, at *9-10.  Applying these considerations to this case, I find that venue in this district is proper.

Having determined that this Court has jurisdiction over this case, that the Respondents are properly named and that venue is proper in this district, I now proceed to consider the merits of the petition.

    **D.**     **Merits of the Petition**

          **1.**  *Statutory Framework*

To determine the legality of Farez-Espinoza's detention, this Court must first review the applicable statutes.  Detention, release and removal of aliens ordered removed from this country is governed by § 241 of the INA, 8 U.S.C. § 1231.  Under § 1231(a), the Attorney General is required to remove an alien from the United States after an order of removal, within the ninety-day "removal period."  8 U.S.C. § 1231(a)(1)(A).  Thus, the DHS has a statutory duty to effect removal within the removal period, if possible.  *Xi v. United States I.N.S.*, 298 F.3d 832, 840 n.6 (9th Cir. 2002); *Ulysse v. Dep't of Homeland Sec.*, 291 F. Supp. 2d 1318, 1324 (M.D. Fla. 2003).  The removal period begins on the latest of the following: (i) the date the order of removal becomes administratively final; (ii) if the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order; or (iii) if the alien is detained or confined (except under the removal process), the date the alien is released from detention or confinement.  8 U.S.C. § 1231(a)(1)(B).  An order of removal entered by an immigration judge in the alien's absence becomes final immediately upon entry of the order.  8 C.F.R. § 1241.1(e).  Under certain circumstances, the removal period may be extended, or "tolled."  Section 1231(a)(1)(C) provides:

> The removal period shall be extended beyond a period of 90 days
> and the alien may remain in detention during such extended period
> if the alien fails or refuses to make timely application in good faith
> for travel or other documents necessary to the alien's departure or
> conspires or acts to prevent the alien's removal subject to an order
> of removal.

During the 90-day removal period, detention of the alien is mandatory.  8 U.S.C. § 1231(a)(2).  However, "[i]f the alien does not leave or is not removed within the removal period,

the alien, pending removal, shall be subject to supervision under regulations prescribed by the Attorney General." 8 U.S.C. § 1231(a)(3). Those regulations require that before making a recommendation or decision to release a detainee, a determination must be made that travel documents for the alien are not available or that immediate removal, while proper, is otherwise not practicable or not in the public interest; the detainee is non-violent and likely to remain non-violent if released; the detainee is not likely to pose a threat to the community following release; the detainee is not likely to violate the conditions of release; and the detainee does not pose a significant flight risk if released. 8 C.F.R. § 241.4(e). The regulations also provide certain factors that should be weighed in considering whether to recommend further detention or release:

> (1) The nature and number of disciplinary infractions or incident reports received when incarcerated or while in Service custody; (2) The detainee's criminal conduct and criminal convictions, including consideration of the nature and severity of the alien's convictions, sentences imposed and time actually served, probation and criminal parole history, evidence of recidivism, and other criminal history; (3) Any available psychiatric and psychological reports pertaining to the detainee's mental health; (4) Evidence of rehabilitation . . . (5) Favorable factors, including ties to the United States such as the number of close relatives residing here lawfully; (6) Prior immigration violations and history; (7) The likelihood the alien is a flight risk or may abscond to avoid removal . . . (8) Any other information that is probative of whether the alien is likely to - - (i) Adjust to life in a community, (ii) Engage in future acts of violence, (iii) Engage in future criminal activity, (iv) Pose a danger to the safety of himself or herself or to other persons or to property, or (v) Violate the conditions of his or her release from immigration custody pending removal from the United States.

8 C.F.R. § 241.4(f).

Section 1231(a)(6) allows for continued detention after the 90-day removal period in certain circumstances:

> An alien ordered removed who is inadmissible under [8 U.S.C. § 1182], removable under [8 U.S.C. § 1227(a)(1)(C), (a)(2) or (a)(4)] or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3).

However, this provision does not permit an alien to be detained indefinitely. The Supreme Court has held that continued detention beyond the 90-day removal period must be limited to "a period reasonably necessary to bring about that alien's removal." *Zadvydas v. Davis*, 533 U.S. 678, 689

11

(2001). That reasonably necessary period, in turn, is limited to the period during which removal is reasonably foreseeable; "if removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute." *Id.* at 699-700. In the interest of uniform administration in the federal courts, the Court recognized that six months of post-removal-period detention pursuant to § 1231(a)(6) is presumptively reasonable. *Id.* at 701.

### 2. *Lack of Statutory Basis for Detention*

The Government essentially makes two alternative arguments to support their contention that Farez-Espinoza's continued detention is authorized under the removal statute. First, the Government contends that the 90-day removal period was triggered and began to run on October 27, 2008, the day that Farez-Espinoza was taken into custody. Alternatively, the Government argues that even if the removal period began when the Order of Removal became administratively final, on July 19, 2007, it was tolled pursuant to § 1231(a)(1)(C) because Farez-Espinoza acted to prevent her removal. Neither argument is persuasive. Rather, I find that the removal period began on July 19, 2007 and the removal period, along with any "presumptively reasonable" detention period under *Zadvydas*, has lapsed. The Government is therefore without statutory authority to continue to hold Farez-Espinoza in custody.

### **The Removal Period and Reasonable Period for Detention Have Expired**

Under the removal statute, the removal period begins when an order of removal becomes administratively final. 8 U.S.C. § 1231(a)(1)(B). A removal order entered in the absence of the alien to whom it refers, such as the removal order at issue in this case, becomes administratively final immediately upon its issuance. 8 C.F.R. § 1241.1(e). Therefore, under the clear language of the statute, Farez-Espinoza's 90-day removal period began to run on July 19, 2007, the date on which the Immigration Court entered the Order of Removal in her absence, and expired in October 2007. Likewise, any presumptively reasonable six-month extended detention to which the Government may have been entitled expired in January 2008. *See Peynado v. Bureau of Immigration & Custom Enforcement*, No. 1:08-CV-2107, 2009 U.S. Dist. LEXIS 3538, at *6 (M.D. Pa. Jan. 20 2009) ("[T]he presumptively reasonable six month period began running on June 27, 2008, the date the removal order became administratively final."); *Jackson v. Chertoff*, No. 08-1575 (SDW), 2008 U.S. Dist. LEXIS 48035, at *10-11 (D.N.J. June 23, 2008); *Lamas v. McKenzie*, No. 07-6035 (SDW), 2008 U.S. Dist. LEXIS 8647, at *32 (D.N.J. Feb. 6, 2008) ("Petitioner's 90-day removal period (as well as his six-month presumptive period under

12

*Zadvydas*) began to run on that very same day."); *Diallo v. Pereira*, No. AW-07-348, 2007 U.S. Dist. LEXIS 96020, at *9 (D. Md. June 29, 2007).

In rejecting the Government's argument that the removal period did not begin until Farez-Espinoza was taken into custody, this Court is instructed by the analysis of the District Court for the Middle District of Florida in *Ulysse v. Dep't of Homeland Security*, 291 F. Supp. 2d 1318 (M.D. Fla. 2003). In that case, a final order of removal of the petitioner was entered on April 14, 2002, but Petitioner received no notice of that order from her attorney. *Id.* at 1321. Petitioner was not placed into custody until July 10, 2003. *Id.* Petitioner had remained at the same address, which had been on file with DHS, from 1999 until June 3, 2003. *Id.* at 1321 n.6. Respondents argued that under their interpretation of the removal statute, which they claimed was entitled to deference as the determination of an administrative agency, the 90-day removal period did not begin until the petitioner was taken into custody. The court noted that the Respondents cited no case law directly on point for this interpretation; similarly, the Government here has presented no authority directly on point. The court went on to review the Respondents' interpretation under the *Chevron* doctrine, which requires the court first to determine whether "Congress has directly spoken to the precise question at issue." *Ulysse*, 291 F. Supp. 2d at 1325 (quoting *Chevron U.S.A., Inc. v. Natural Resources Def. Counsel*, 467 U.S. 837, 842 (1984)). Where the intent of Congress is clear, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* (citing *Chevron*, 467 U.S. at 843. With respect to the issue before it, the Florida court then determined that Congress had spoken to the issue directly in the removal statute and intended for inadmissible, excludable or removable aliens to be deported within 90 days, if possible. *Id.* "This is evidenced not only by the clear language of the statute, but also by the change in the statutory language in 1996 . . . reduc[ing] the amount of time that the Attorney General has to deport an alien from six months to 90 days. . . ." *Id.* (citing *Kai v. I.N.S.*, 97 Civ. 0869 (DC), 1997 WL 786946, at *2 (S.D.N.Y. Dec. 22, 1997). The *Ulysse* court noted, correctly it seems, that under the Respondents' interpretation of the removal statutes,

> Respondents could arbitrarily trigger commencement of the removal period by simply waiting to take an alien into custody. This interpretation, however, flies in the face of the plain reading of the statute and Congress' intent that removal of the alien, or at least a bona fide attempt to remove the alien, should be done within 90 days of the removal order being final. . . If Respondents are allowed the liberty to decide when they will comply or even attempt compliance with the statutes that they are charged with

13

> enforcing, the statutory scheme will be rendered a nullity and Congress' intent to remove illegal aliens as quickly possible will be thwarted. Federal agencies should not and do not have such power.

*Id.* at 1325-26. Because the court found that the Government had provided no justification for its almost 17-month delay in detaining the petitioner and removing her from the United States, in contravention of the statute, and because there was no reason to suspend the removal period pursuant to 8 U.S.C. § 1231(a)(1)(C), the court held that the Respondents were without statutory authority to detain the petitioner and granted her *habeas* petition. *Id.* at 1326.

Farez-Espinoza's case arises under circumstances virtually identical to those in *Ulysse*. Farez-Espinoza was ordered removed two and a half years ago, when the Immigration Court entered an order in her absence. She received no notice of that removal order until October 2008, when she was taken into custody by ICE. At all times since her arrival in this country, Farez-Espinoza's address and whereabouts have been on file with DHS and the Government has shown no reason why it did not pursue removal of Farez-Espinoza until more than 15 months after her order of removal was entered. Therefore, I cannot accept the Government's contention that it could arbitrarily trigger the removal period by its unilateral action of choosing not to pursue Farez-Espinoza's removal for more than a year. Rather, I find that the removal period, as well as any presumptively reasonably six-month period of removal to which the Government may have been entitled began to run on July 19, 2007 and expired in October 2007 and January 2008 respectively.[5]

## The Removal Period Was Not Extended Under §1231(a)(1)(C)

Since I have concluded that the removal period was triggered by the entry of the Order of Removal on July 19, 2007, the only statutory provision under which the Government could

---

[5] It is worth noting that, even if this Court were to find in the Government's favor and hold that the removal period did not begin until Farez-Espinoza's arrest in October 2008, it is unclear whether, as of today, the Respondents would retain authority to continue to detain her. If the removal period was triggered on October 27, 2008, it would have expired on Saturday, January 24, 2009. Although it is well-settled by now that the Supreme Court in *Zadvydas* established a presumptively reasonable period of continued detention of six months, and under that holding, Respondents would be entitled to an additional three months of detention to expire in April 2009, it is important to note that on January 20, 2009, the Immigration Court entered a stay of the removal order. Therefore, as of that date, the removal order is no longer in effect. Although it is not necessary to this Court's holding, there does appear to be authority for the proposition that when an order of removal is stayed, because the removal period does not begin until the date of a *final* removal order, 8 U.S.C. § 1231(a)(1)(B)(ii), there is no statutory authority to detain an alien during the pendency of the stay because the removal period has not yet begun. *See Bejjani v. I.N.S.*, 271 F.3d 670, 689 (6th Cir. 2001), *overruled on other grounds*, *Fernandez-Vargas v. Gonzales*, 548 U.S. 30 (2006).

potentially have authority to continue to hold Farez-Espinoza in custody is 8 U.S.C § 1231(a)(1)(C). That statute provides for an extension or "tolling" of the removal period if an alien "conspires or acts to prevent the alien's removal." Id.  In relying on this provision, the only fact to which the Government has pointed as evidence of Farez-Espinoza's prevention of her own removal is her failure to appear at her removal proceedings in July 2007.  This act, or failure to act, is insufficient to trigger an extension of the removal period under § 1231(a)(1)(C).

A review of the case law shows that the courts have read § 1231(a)(1)(C) narrowly. Generally, courts have only tolled the removal period in cases where the alien has demonstrated some sort of bad faith failure to cooperate, such as providing the INS with false or inconsistent information regarding his identity or country of origin, or refusing to complete travel arrangements or name a country for deportation.  Thus, where continued detention under § 1231(a)(1)(C) has been upheld, the alien subject to the removal order committed some affirmative and misleading act to thwart the removal process or expressly refused to cooperate. *See, e.g.*, *Drabovskiy v. Young*, No. 2:07-cv-1385 SECTION P, 2008 U.S. Dist. LEXIS 93793, at *14-15 (W.D. La. Sept. 30, 2008) (removal period tolled under § 1231(a)(1)(C) because petitioner hampered ICE's efforts to remove him by refusing to request travel documents and repeatedly refusing to provide background and demographic information necessary to obtain travel documents); *Akinsehinwa v. Donate*, No. 1:CV-08-00395, 2008 U.S. Dist. LEXIS 57982, at *15-17 (M.D. Pa. July 30, 2008) (removal period tolled where petitioner gave inconsistent information to the Consulate, hindering efforts to obtain travel documents); *Agbanyo v. Cabral*, 518 F. Supp. 2d 326, 327-28 (D. Mass. 2007) (dismissing *habeas* petition where petitioner not only failed to cooperate, but actively obstructed efforts to remove him); *Powell v. Ashcroft*, 194 F. Supp. 2d 209 (E.D.N.Y. 2002) (petitioner's false and conflicting representations regarding identity and citizenship prevented removal within the meaning of § 1231(a)(1)(C)); *Ncube*, 1998 U.S. Dist. LEXIS 18902, at *40-41 (finding that "the suspension period rule applies . . . since [petitioner] has provided unverifiable, inconsistent and erroneous information to the INS"), *adopted*, Order dated Jan. 5, 1999 (Doc No. 24)(Baer, J.); *see also Pelich v. I.N.S.*, 329 F.3d 1057, 1060 (9th Cir. 2003) (rejecting petitioner's claim of indefinite detention where petitioner "ha[d] the keys to his freedom in his pocket and could likely effectuate his removal by providing the information requested by the INS") (internal quotation marks and citations omitted); *Sango-Dema v. District Dir., I.N.S.*, 122 F. Supp. 2d 213, 221 (D. Mass. 2000) ("an alien cannot trigger

15

[a constitutional right to be free from indefinite detention by INS] with his outright refusal to cooperate with INS officials"). Not this case.

Here, Farez-Espinoza committed no affirmative misleading act that prevented her return, nor did she refuse to cooperate with the removal order. Her uncontested allegation is that she had no notice of the removal order and therefore she could not have acted affirmatively to thwart the Government's attempts to enforce the order. Thus, far from attempting to hide or abscond to avoid the enforcement of the order, Farez-Espinoza continued to live with her family and her whereabouts were well known to the Government for over 15 months before she was taken into custody. Her failure to appear at her Immigration Court hearing does not rise to the level of "bad faith failure to cooperate" necessary to trigger the extension provision of § 1231(a)(1)(C). *See Rajigah v. Conway*, 268 F. Supp. 2d 159, 165 (E.D.N.Y. 2003); *see also Ulysse*, 291 F. Supp. 2d at 1324 n.11, 1326 (§ 1231(a)(1)(C) was inapplicable when petitioner was unaware of the removal order and had made no attempt to hide or abscond).

Furthermore, as noted earlier, the Congressional intent underlying § 1231 is for the Attorney General to remove an alien subject to an order of removal within the 90-day removal period, if possible.[6] *See Xi*, 298 F.3d at 840 n.6; *Ulysse*, 291 F. Supp. 2d at 1324. Thus, it is the responsibility of DHS to make a bona fide attempt to do so within the removal period. *See id.* Where ICE does not fulfill its responsibility, § 1231(a)(1)(C) does not apply. *Ulysse*, 291 F. Supp. 2d at 1324 n.11. Here, as noted, Respondents have had Farez-Espinoza's home address in Ridgewood, New York at least as early as September 2006. She has remained at the same address for over two years. There is no evidence that Respondents made any effort to contact Farez-Espinoza or to take any other actions to enforce the removal order. As in *Ulysse*, this Court wonders "what possible policy objective would be accomplished by incarcerating [Petitioner], at the taxpayers' expense, while her proceedings and judicial review are in progress. Obviously, Respondents have no concern that [she] is a flight risk or a danger to society because they made no effort to remove or detain her sooner." *Id.* at 1326 n.13.

Under these circumstances, § 1231(a)(1)(C) does not serve to extend the removal period which, as noted earlier, expired in October 2007.

---

[6] Indeed, the terms of the removal statute and its accompanying regulations appear to presume that the alien is detained during the initial 90-day period. *See* 8 U.S.C. § 1231(a)(2) (providing for mandatory detention during the removal period); 8 U.S.C. § 1231(a)(3) (providing for supervised release after the expiration of the removal period); 8 U.S.C. § 1231(a)(6) (providing that certain aliens "may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in [§ 1231(a)(3)]").

Accordingly, because the removal period and any presumptively reasonable detention period has expired, and the removal period was not tolled pursuant to § 1231(a)(1)(C), this Court finds that the Respondents are without statutory authority to detain Farez-Espinoza.[7] Indeed, 8 U.S.C. § 1231(a)(3) contemplates release from detention after the removal period has expired under the supervision of the Respondents pursuant to the regulations. The factors favoring release enumerated in those regulations counsel in favor of Farez-Espinoza's release. For example, the record indicates that Farez-Espinoza has no previous history of disciplinary infractions, criminal conduct or convictions, psychiatric problems, or prior immigration violations; she has strong ties to the United States and the New York metropolitan area, including her father and step-mother, a naturalized United States citizen since 1988; and there is no evidence that she will present a flight risk, pose a danger to the community or violate the conditions of her release pending the conclusion of her proceedings in Immigration Court. *See* 8 C.F.R. § 241.4(f).

### III. CONCLUSION

For the foregoing reasons, it is ORDERED that Farez-Espinoza's petition for writ of *habeas corpus* is GRANTED. Petitioner shall be released from custody on or before noon on Wednesday, February 4, 2009. Respondents shall arrange for supervision of Petitioner in accordance with the usual practice. Petitioner may not be taken into custody by Respondents unless (1) there is a change in circumstances, as that term has been construed by the courts; or (2) Petitioner violates the conditions of her release; or (3) Petitioner receives an adverse ruling from the Immigration Court, BIA and/or Second Circuit Court of Appeals.[8]

---

[7] Because I find that Farez-Espinoza is entitled to *habeas* relief based on a lack of statutory authority to detain her, I need not consider her alternative argument that her continued detention is in violation of her constitutional due process rights.

[8] Merely because this Court has determined that the removal period that began upon the entry of the order of removal has expired does not foreclose the possibility that Respondents may one day reacquire authority to detain her pursuant to the removal statute. The statute provides that the removal period begins at the *latest date* of three potential events. *See* 8 U.S.C. § 1231(a)(1)(B). Now that Farez-Espinoza's proceeding before the Immigration Court has been reopened, if the Immigration Court ultimately determines that she should be removed from the United States, a new removal period will have been triggered pursuant to § 1231(a)(1)(B)(ii). In other words, an adverse determination in the Immigration Court will serve as a superceding event that acts to start the 90-day removal period anew. *See Lamas*, 2008 U.S. Dist. LEXIS 8647, at *30. As one court has explained:

> [There cannot] be only one removal period . . . that is the only rational reading of the statute . . . [T]he statute provides that the removal period

17

The court will place the matter in suspense until March 30, 2009, at which time the Clerk is instructed to close the case and remove it from my docket.

IT IS SO ORDERED.
January 28 2009

                                                U.S.D.J.

Michael Chertoff
Secretary Department of Homeland Security
(or his successor)

Michael Mukasey
Attorney General of the United States
(or his successor)

Warden of the Columbia County Prison
721 Iron St, Bloomsburg, PA 17815
(570) 784-4815

---

> begins on the latest of several dates. The passing of one date does not stop the operation of the statute. In a sense, the only way to apply the statute to a given situation is retrospectively. That is, the removal period begins when the removal order becomes final. If a court issues a stay [or a new detention unrelated to removal proceedings takes place], the removal period begins [anew] when the stay is lifted [or when such new detention ends]. Therefore, the only way to determine when the removal period begins, or began, is to look at what events already have occurred. If there is another potential event, there is another potential beginning date for the removal period. The only sensible reading of this provision is that [DHS] is required to effectuate the removal within 90 days of certain events, but will have another 90 days if another one of the designated events occurs at a later date. The obvious reason for this is that [DHS's] authority to effect the removal is suspended due to the occurrence of the later event (such as a stay order [or a new detention on criminal charges]).

*Michel v. I.N.S.*, 119 F. Supp. 2d 485, 498 (M.D. Pa. 2000); *accord Zamel v. Smith*, No. 07-4453 (SDW), 2007 U.S. Dist. LEXIS 83336, at *8-9 n.7 (D.N.J. Nov. 9, 2007); *Morena v. Gonzales*, 2005 U.S. Dist. LEXIS 37989, at *18 (M.D. Pa. Oct. 4, 2005).